## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Case No: 15-11322-KJC |
|  | : | Chapter 11 |
| Citadel Energy Holdings, LLC, *et al.*,[1] | : | |
|  | : | (Jointly Administered) |
| Debtors. | : | |
|  | : | **Hearing Date: October 16, 2015 at 10:00 a.m.** |
|  | : | **Objection Deadline: October 9, 2015 at 4:00 p.m.** |
|  | : | |

### MOTION OF NATHAN DAHL FOR RELIEF FROM THE AUTOMATIC STAY TO CONTINUE EVICTION PROCEEDING RELATED TO SALTWATER INJECTION AND SURFACE USE LEASE DATED SEPTEMBER 12, 2013

Nathan Dahl ("Mr. Dahl"), by and through his undersigned counsel, hereby files this motion ("Motion") for an entry of an order, in substantially the form attached hereto as **Exhibit A**, granting Mr. Dahl relief from the automatic stay pursuant to 11 U.S.C. § 362(d) in order to allow the prepetition eviction proceeding commenced by Mr. Dahl against Pembroke Fields, LLC ("Pembroke") in McKenzie County, North Dakota to proceed so that Mr. Dahl may terminate the Lease (as defined herein) and re-take possession of the Leased Premises (as defined herein) and exercise all rights and remedies afforded to him under the Lease (as defined herein) and North Dakota law.  In support of this Motion, Mr. Dahl respectfully states as follows:

### JURISDICTION

1.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Determination of the Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(G).  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Citadel Energy Services, LLC (7762); Pembroke Fields, LLC (0341); Citadel Watford City Disposal Partners, LP (1520); Citadel Energy SWD Holdings, LLC (5266); Citadel Energy Holdings, LLC (5061).  The Debtors' address is 502 3rd Ave. SW, Watford City, North Dakota 58854.

2.      The predicates for relief sought herein are Sections 361, 362 and 363 of Title 11 of the United States Code (hereinafter, the "Bankruptcy Code"), Rule 4001(a) of the Federal Rules of Bankruptcy Procedure and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

## BACKGROUND

### A.      The Chapter 11 Case.

3.      On June 19, 2015 (the "Petition Date"), Citadel Energy Services, LLC ('Citadel Energy Services"), Pembroke, Citadel Watford City Disposal Partners, LP ("Citadel Watford"), Citadel Energy SWD Holdings, LLC ("Citadel Energy SWD") and Citadel Energy Holdings, LLC ("Citadel Energy Holdings" and, together with Citadel Energy Services, Pembroke, Citadel Watford and Citadel Energy SWD, each a "Debtor" and together, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court") commencing the above captioned chapter 11 cases (collectively, the "Chapter 11 Case").

4.      Upon information and belief, the Debtors continue to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On July 20, 2015, the Office of the United States Trustee for the District of Delaware appointed a creditors' committee (the "Committee") in the Chapter 11 Case.

6.      On August 5, 2015, the Office of the United States Trustee for the District of Delaware filed a motion seeking the appointment of a chapter 11 trustee, or in the alternative the

DM3\3449420.6

appointment an examiner or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code [D.I. 76] (the "Trustee Motion").[2]

7.      As of the date hereof, the Debtors have not sought authority to obtain any debtor-in-possession financing, despite admitting in the *Declaration In Support Of The Debtors' Petitions And First Day Motions* that they are suffering from a "severe liquidity crisis," *see*, D.I. 5, ¶ 11, and more recently, admitting that without debtor-in-possession financing they only have enough cash to operate through the third week in September, *see* Mark Christopher Dopson 8/26/15 Depo. Transcript 61:7-10 (excerpt attached hereto as **Exhibit B**).

8.      As of the date hereof, the Debtors have neither filed a plan of reorganization nor presented a motion to sell any and/or substantially all of the Debtors' assets.

**B.      The Saltwater Injection And Surface Use Lease**

9.      Mr. Dahl owns the real property located at SWSW Section 34, T148, R98W, McKenzie County, North Dakota (the "Premises").

10.      Prior to the Petition Date, Mr. Dahl and Pembroke entered into that certain Saltwater Injection And Surface Use Lease dated as of September 12, 2013 (the "Lease").  A true and correct copy of the Lease is attached hereto as **Exhibit C** and incorporated herein by reference.

11.      Pursuant to the Lease, Mr. Dahl leases ten (10) acres[3] on Premises (the "Leased Premises") to Pembroke "for the purpose of drilling, constructing, operating, maintaining, repairing and removing a saltwater disposal facility and associated liquids processing, including subsurface rights (provided that no subsurface materials shall be mined or removed from the

---

[2] The Court has scheduled a hearing on the Trustee Motion for September 15, 2015.
[3] The Lease states that the Leased Premises is "not to exceed 10 acres, exact acreage to be determined in upcoming survey."  *See* Ex. C (Lease) at p. 9.

[Leased Premises])." *See* Ex. C (Lease) at p. 1.  The Lease also grants Pembroke an "exclusive subsurface easement to inject saltwater and accompanying liquids and semi-solids into and through the wellbore of the Salt Water Disposal Well… located on the [Leased Premises]." *Id.* at ¶ 3.

12.     The Lease requires, *inter alia*, Pembroke to pay Mr. Dahl a monthly rent (the "Monthly Rent") "equal to the sum of ten cents (.10) for each barrel of saltwater and accompanying liquids and semi-solids (the "Injected Fluids") injected into the Salt Water Disposal Well [hereinafter, the "Well"] during the immediately prior month." *Id.* at ¶ 4(b).  The Lease provides that Pembroke "shall, at its expense, utilize meter(s) and maintain accurate records to determine the amount of Injected Fluids actually injected.  An accounting of the meter data and amount of Injected Fluids injected shall be furnished to [Mr. Dahl] on a monthly basis and included with each monthly rent payment." *Id.* at ¶ 4(c).

**C.     Pre-Petition Defaults And The Eviction Proceeding**

13.     Prior to the Petition Date, on June 2, 2015, due to existing "events of default" under the Lease, Mr. Dahl commenced an eviction proceeding in the District Court of the State of North Dakota, County of McKenzie, Northwest Judicial District (the "State Court"), Civil No. 27-2015-CV-00161 (the "Eviction Proceeding").  A true and correct copy of the Complaint for Eviction (the "Eviction Complaint") and related Summons is attached hereto as **Exhibit D** and incorporated herein by reference.

14.     Recordation of The Mechanic's Liens.  Specifically, as set forth in the Eviction Compliant, Pembroke failed to pay certain of its vendors for materials supplied to the Leased Premises and/or improvements made to the Leased Premises in violation of Paragraph 2(i) of the

DM3\3449420.6

Lease.[4]  As a result, five (5) mechanics' liens (the "Mechanics' Liens") were recorded against the Leased Premises.  The Mechanics' Liens, true and correct copies of which are attached hereto as **Exhibit E**, total $1,173,119.74, before application of interest and any other fees and costs the lien holders may be entitled to under the applicable statute.  The Mechanics' Liens are summarized as follows:

| Lien Holder | Amount Recorded | Date Recorded |
| --- | --- | --- |
| K & R Well Service | $12,925.20 | March 4, 2015 |
| K & R Roustabout | $949,268.82 | March 4, 2015 |
| Meadowlark Companies, Inc. | $40,367.50 | June 17, 2014 |
| Mid-States Supply Company, Inc. | $130,371.00 | March 30, 2015 |
| Bakersfield Pipe & Supply Inc. | $40,187.41 | December 10, 2014 |

15.    <u>Failure to Pay Monthly Rent and Other Amounts</u>.  As noted in the Eviction Complaint, Pembroke also failed to pay Mr. Dahl the Monthly Rent that was due and owing on April 15, 2015,[5] in violation of Section 4(b) of the Lease, and the interest that had accrued on the Monthly Rent for October 2014, November 2014, December 2014, January 2015, February 2015, March 2015 and April 2015 in violation of Paragraph 4(d) of the Lease.[6] [7]

---

[4] Pursuant to paragraph 2(i) of the Lease Pembroke: "shall be responsible for all costs and expenses in building, developing, improving and maintaining the [Leased Premises], facility and well bore… and any improvements upon or associated with the same." Ex. C (Lease) at ¶ 2(i).

[5] At the time the Eviction Complaint was filed, only April's Monthly Rent was outstanding. However, Pembroke had habitually failed to pay the Monthly Rent on time. For example, the Monthly Rent for October 2014 through January 2015 was paid in one lump sum in February 2015, rather than at the end of each month.  The Monthly Rent for February 2015 and the Monthly Rent March 2015 was not paid until May 2015 and again, was paid in one lump sum. The Monthly Rent for April 2015 was not paid until June 2015.

[6] Pursuant to Paragraph 4(d) of the Lease, interest shall accrue at the rate of 1.5% per month (18% per annum) on all sums owing to Mr. Dahl unpaid after thirty (30) days. Ex. C (Lease) at ¶ 4(d).

[7] As of the Petition Date, Pembroke had cured the deficient Monthly Rent.  However, Pembroke had not paid any interest that was (and still is) due and owing to Mr. Dahl.

16.     On June 19, 2015, the State Court was scheduled to hold a hearing in the Eviction Proceeding (the "June 19 Eviction Hearing").  As set forth in the Summons, if Pembroke failed to appear at the June 19 Eviction Hearing, a judgment by default would be entered.

17.     Rather than cure the existing defaults and/or defend itself in the Eviction Proceeding, hours before the June 19, 2015 Eviction Hearing, the Debtors commenced the Chapter 11 Case.

**C.     Other Breaches Of The Lease Agreement And Bad Acts By The Debtors**

18.     In addition to the material events of default referenced in the Eviction Complaint, Pembroke is in breach of other obligations under the Lease, some of which have only recently come to Mr. Dahl's attention.  Additionally, the Debtors have committed certain acts that are highly prejudicial to Mr. Dahl and create an undue hardship.

19.     Prepetition Lease Assignment and Sale.  First and foremost, it recently came to Mr. Dahl's attention that prior to the Petition Date Pembroke assigned the Lease and sold all of its personal property rights in the Leased Premises and all of its permits, licenses and/or governmental approval rights related to drilling, use and operation of the Well and the Leased Premises to North Dakota Water Partners, LLC (the "Prepetition Lease Assignment and Sale").[8]

20.     The Prepetition Lease Assignment and Sale is evidenced by that certain Assignment and Assumption Agreement dated as of May 1, 2015 by and between Pembroke and North Dakota Water Partners, LLC and that certain Bill of Sale dated May 1, 2015, copies of which are attached hereto as **Exhibit F** and **Exhibit G**, respectively.

---

[8] Upon information and belief, North Dakota Water Partners, LLC is controlled by three limited partners of Citadel Watford.

21.     The Prepetition Lease Assignment and Sale occurred without Mr. Dahl's knowledge or consent and is a violation of Paragraph 16(h) of the Lease, which provides that the "Lease may not be assigned without consent of [Mr. Dahl] . . . ." Ex. C (Lease) at ¶ 16(h).

22.     According to Mark Dunaway, the Debtors' principal and/or director, the Prepetition Lease Assignment and Sale was subsequently, for lack of a better term, reversed, and North Dakota Water Partners, LLC assigned the Lease and the related assets back to Pembroke (the "Subsequent Re-Assignment").  However, was unable to provide any detail during his recent deposition regarding the Subsequent Re-Assignment and Sale, including when it took place and whether it was documented.[9]

23.     Assuming the Subsequent Re-Assignment did in fact take place, it too occurred without Mr. Dahl's knowledge or consent and is a violation of Paragraph 16(h) of the Lease.

24.     The Solids Permit.  Second, prior to the Petition Date, without Mr. Dahl's knowledge or consent, Citadel Energy Services applied for and obtained a permit authorizing it to construct and operate an oil treating and oilfield waste treating/processing facility on the Leased Premises (the "Solids Permit").[10]  A true and correct copy of the Solids Permit is attached hereto as **Exhibit H**.

25.     Thereafter, the Debtors took steps to utilize the Solids Permit, including expanding the pad located on the Leased Premises.  In fact, upon information and belief, the Debtors' more than doubled the size of the pad.

---

[9] According to the Office of the United States Trustee, no writing has been produced by the Debtors evidencing the Subsequent Re-Assignment. *See* D.I. 145 at ¶ 25.

[10] The Solids Permit was also assigned and/or sold to North Dakota Water Partners, LLC prior to the Petition Date, as evidenced by that certain Assignment and Assumption of Permits and License Agreement dated May 1, 2015 by and between Citadel Energy Services and North Dakota Water Partners, LLC.

7

26.     Mr. Dahl became aware of Solids Permit and the Debtors' pad expansion by coincidence prior to the Petition Date and thereafter notified the Debtors that he did not consent to a solids facility on the Leased Premises.  Mr. Dahl also advised the Debtors that they were not authorized to construct or operate a solids facility on the Leased Premises under the Lease.

27.     Despite Mr. Dahl's position, upon information and belief, prior to the Petition Date, the Debtors continued to market and explore opportunities to utilize the Solids Permit.  The Debtors have also continued to do so post-petition.  In paragraph 8 of the Debtors' motion to appoint a Chief Restructuring Officer [D.I. 112], the Debtors state that they have the Solids Permit, which they claim is "valuable," and that they "expect that if they obtained the funds to take the steps necessary to exploit the permit, the Debtors' profitability would increase significantly." In paragraph 20 of the Debtors' objection to the Trustee Motion [D.I. 121], the Debtors state they are seeking an investor to help them "exploit their valuable 'solids permit' that would allow the Debtors to handle the disposal of a wider array of oil extraction byproducts."

28.     <u>Inconsistent Reporting Of Injected Fluids</u>.  Third, it recently came to Mr. Dahl's attention that certain of the reports provided to him by Pembroke indicating the amount of Injected Fluids actually injected on the Leased Premises (the "<u>Landlord Injected Fluids Reports</u>"), which determine the Monthly Rent due and payable under the Lease, appear to be inconsistent with the reports Pembroke has provided to the State of North Dakota (the "<u>Government Injected Fluids Reports</u>").  A true and correct copy of the most recent Landlord Injected Fluids Report is attached hereto as **Exhibit I** and a summary of the most recent Government Injected Fluids Report is attached hereto as **Exhibit J**.

DM3\3449420.6

29.     The inconsistencies are highlighted below in bold text:

|  | BBLS Reported in Landlord Injected Fluids Report | BBLS Reported in Government Injected Fluids Report |
|---|---|---|
| **October 2014** | **5,285** | **3,323** |
| November 2014 | 22,346 | 22,346 |
| December 2014 | 37,068 | 37,068 |
| January 2015 | 31,773 | 31,773 |
| February 2015 | 23,956 | 23.956 |
| **March 2015** | **87,366** | **98,680** |
| **April 2015** | **232,807** | **163,209** |
| **May 2015** | **182,461** | **110,885** |
| **June 2015** | **152,091** | **98,967** |
| July 2015 | 110,587 | Not yet publically available |

30.     <u>Unauthorized Use of the Five Acres on the Premises.</u>.   Fourth, it also recently came to Mr. Dahl's attention that the Debtors are operating on and/or using approximately fifteen (15) acres on the Premises, rather than the ten (10) acres allotted to Pembroke under the Lease.  The Debtors' unauthorized use of an additional five (5) acres is, essentially, trespassing.

31.     <u>Failure to Control Noxious Weeds.</u>   Finally, the Lease requires Pembroke to "keep the [Leased Premises] reasonably free and clear of waste and obstructions and control noxious weeds."  Ex. C (Lease) at ¶2(f).  Further, North Dakota law requires a landowner to keep property free of noxious weeds.  N.D.C.C. § 4.1-47-02.  If a landowner fails to do so, he or she is strictly liable.   Pembroke has failed to control the growth of noxious weeds on the Leased Premises in violation of paragraph 2(f) of the Lease.

## RELIEF REQUESTED AND BASIS THEREFOR

32.     Mr. Dahl is seeking relief from the automatic stay so that he may proceed with the Eviction Action in order to terminate the lease, take-back possession of the Leased Premises and exercise all rights and remedies afforded to him under the Lease and North Dakota law.

33.     The automatic stay is one of the more fundamental protections provided to a debtor under the Bankruptcy Code.  However, as this Court has stated, it "is not meant to be

9

absolute, and in appropriate instances relief may be granted." *In re The SCO Grp., Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007) (citing W*edgewood Inv. Fund, Ltd. v. Wedgewood Realty Grp., Ltd. (In re  Wedgewood)*, 878 F.2d 693, 697 (3d Cir. 1989)).

34.     Section 362(d) of the Bankruptcy Code provides, on request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay by terminating, annulling, modifying, or conditioning such stay:

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>
>> (A) the Debtor does not have an equity in such property; and
>>
>> (B) such property is not necessary to an effective reorganization;

11 U.S.C. §§ 362(d)(1), (d)(2).

35.     The test for granting relief from the automatic stay is raised in the disjunctive; the party seeking relief need only satisfy subsection 362(d)(1) or (2). *In re Kleinman*, 156 B.R. 131, 136 (Bank. S.D.N.Y. 1993).

**I.     Mr. Dahl is Entitled to Relief from the Automatic Stay For "Cause"**

36.     "Except for lack of adequate protection, "cause" is not defined by § 362(d)(l). Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *SCO Grp., Inc.*, 395 B.R. at 857 (citing *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir.1997); *In re Laguna Assocs. Ltd.*, 30 F.3d 734, 737 (7th Cir. 1994); *In re The Score Bd., Inc.*, 238 B.R. 585, 598 (D.N.J. 1999); *Am. Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 152 B.R. 420, 424 (D. Del. 1993)).     The

determination of whether "cause" exists to vacate the automatic stay is committed to the sound discretion of the bankruptcy court. *See In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d 1280, 1286 (2d Cir. 1990) (citing *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 507 (7th Cir. 1982)); *In re Milstein*, 304 B.R. 208, 211 (Bankr. E.D. Pa. 2004) (citations omitted).  In making this determination, courts must consider "the interests of the debtor, the claimant and the estate." *In re Macinnis*, 235 B.R. 255, 259 (Bankr. S.D.N.Y. 1998).  The legislative history of Section 362 states that cause may be shown by a single factor. *Izzarelli v. Rexene (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343-344 (1977)).

37.    This Court has developed a three-prong balancing test to determine whether to grant relief from the stay: (i) whether any great prejudice to either the bankrupt estate or the debtor will result; (ii) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (iii) the probability of the creditor prevailing on the merits. *SCO Grp., Inc.*, 395 B.R. at 857 (citing *Rexene*, 141 B.R. at 576). This Court also considers general policies underlying the automatic stay when deciding whether to grant a motion to lift the stay. *SCO Grp.* 395 B.R. at 857 (citing *Sonnax* factors).[11]

---

[11] Those factors are: 1) whether relief would result in a partial or complete resolution of the issues; 2) lack of any connection with or interference with the bankruptcy case; 3) whether the other proceeding involves the debtor as a fiduciary; 4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; 5) whether the debtor's insurer has assumed full responsibility for defending it; 6) whether the action primarily involves third parties; 7) whether litigation in another forum would prejudice the interests of other creditors; 8) whether the judgment claim arising from the other action is subject to equitable subordination; 9) whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor; 10) the interests of judicial economy and the expeditious and economical resolution of litigation; 11) whether the parties are ready for trial in the other

Case 15-11322-KJC    Doc 150    Filed 09/14/15    Page 12 of 17

38.     Based upon the totality of the circumstances, sufficient cause exists to lift the automatic stay in the instant case.

**A.      The Debtors' And Their Estates Will Suffer Little Prejudice, If Any, If Relief From Stay Is Granted**

39.     The Debtors may argue that they will suffer great prejudice if the Motion were granted.  However, a close examination of the facts and circumstances surrounding the Debtors and their business demonstrates that the Debtors and their estates will suffer little prejudice, if any, if the Motion is granted.

40.     First and foremost, if the transaction evidenced by the Prepetition Lease Assignment and Sale has not been "reversed", as the Debtors claim, Pembroke has absolutely no interest in the Lease, the personal property located on the Leased Premises or the licenses and/or permits necessary to operate the Well on the Leased Premises.  Hence, absent proof of the Subsequent Re-Assignment, there will be absolutely no prejudice to the Debtors or their estates if the Motion is granted.

41.     Second, assuming the Subsequent Re-Assignment did occur and Pembroke is the current lessee under the Lease, the Debtors' business plan appears to be premised on use of the Solids Permit on the Leased Premises.  However, Mr. Dahl does not consent to use of the Solids Permit on the Leased Premises and the Lease does not authorize use of the Solids Permit on the Leased Premises.  Additionally, the Leased Premises is not zoned for a solids facility.  Accordingly, the Debtors' business plan is futile and their estates will suffer little, if any, prejudice if the Motion is granted.

---

proceeding; and 12) impact of the stay on the parties and the balance of the harms.  *Sonnax*, 907 F.2d at 1287.

12

42.     Third, the Debtors, by their own admission, do not need the Lease much beyond the filing of this Motion if they do not obtain an infusion of capital and/or emergency post-petition financing.  The Debtors admit that they commenced the Chapter 11 Case due to "severe liquidity crisis."   First Day Declaration at ¶ 11.   The Debtors' Director of Operations also recently testified that the Debtors' only have enough cash to operate through the third week in September.   Ex. B (Dopson Depo. Transcript) 61:7-10.   Accordingly, due to the lack of financing, the likelihood of a successful reorganization is grim.

43.     Finally, the Lease clearly provides that "all tanks, buildings, structures and equipment placed upon the [Leased Premises] by [Pembroke] . . . shall be and remain the property of [Pembroke] . . . ."   *See* Ex. C (Lease), at 4, ¶ 9.  Therefore, granting Mr. Dahl relief from the stay does not prevent the Debtors from relocating their operations elsewhere.

44.     Based on the foregoing, the first factor heavily weighs in favor of granting the Motion.

**B.     The Hardship To Mr. Dahl Considerably Outweighs Any Hardship The Debtors May Suffer**

45.     The Debtors have been nothing but trouble since the Lease was signed and allowing them to remain on the Leased Premises is a continuing liability to Mr. Dahl.

46.     To briefly summarize, the Debtors allowed the Mechanics' Liens to be recorded against the Leased Premises.  The Mechanics' Liens act as a cloud on Mr. Dahl's title to the Leased Premises.  Further, they depreciate the market value of the Leased Premises.  *See, e.g., Putnam v. Heathman*, 367 S.W.2d 823, 830 (Mo. Ct. App. 1963) ("The pendency of the lien claim is an encumbrance on the real estate, and would tend to depreciate the market value and

salability of the property affected."). As time passes, the value of the Mechanics' Liens increase due to interest, fees and costs that are accruing thereon.

47.    Additionally, the Debtors' operations are inherently dangerous and can easily result in environmental liability, a liability for Mr. Dahl, as the landowner, would ultimately be responsible. Yet, the Debtors have shown a complete disregard for and lack of respect for Mr. Dahl's and the risk he bears. This is demonstrated by, *inter alia*, the Debtors' (i) obtaining the Solids Permit without Mr. Dahl's knowledge or consent, (ii) significantly expanding the pad without Mr. Dahl's knowledge or consent, (iii) entering into the Prepetition Lease Assignment and Sale, which occurred without Mr. Dahl's knowledge or consent and constitute material breaches of the Lease, (iv) entering into the alleged Subsequent Re-Assignment, another transaction that occurred without Mr. Dahl's knowledge or consent and constitutes another material breach of the Lease, (v) unauthorized use of approximately five (5) additional acres of the Premises without Mr. Dahl's knowledge or consent and without any compensation to Mr. Dahl, and (vi) failure to control noxious weeds, which Mr. Dahl could be held strictly liable for under state law.

48.    The inconsistent Injected Fluids reports are also alarming.[12]    The failure of Pembroke to appropriately report according to the rules and regulations of the North Dakota Industrial Commission, Department of Mineral Resources, jeopardizes the existence of the Debtors' injection permit (assuming Pembroke is still the permit holder). Also, the permit contains certain injection pressure parameters for the protection of the injecting geologic

---

[12] Upon information and belief, the Debtors reporting to both the State of North Dakota and Mr. Dahl is and has been inaccurate, due in part to meters that do not or did not work. It is also rumored that the amount of Injected Fluids actually injected by the Debtors on the Leased Premises has been significantly higher than what has been reported to Mr. Dahl.

14

formation and surrounding geographic strata.  The failure to adequately monitor and report injection pressures raises the specter that Pembroke's activities may permanently destroy the ability of the geologic formation to accept and contain injected fluids.  One effect of that destruction, beyond loss of use and future injection income, could be liability for subsurface trespass of fluids stemming from operating outside the permitted pressures.

49.    For these reasons and more, it is apparent that the Debtors' business is rife with internal chaos and mismanagement.  This is also of great concern to Mr. Dahl, who has absolutely no trust in the Debtors or in their ability to reorganize.

50.    As long as the Debtors remain in possession of the Leased Premises (and of that portion of the Premises that the Debtors are using without Mr. Dahl's consent), Mr. Dahl suffers considerable harm, as summarized above, and that harm greatly outweighs the harm, if any, that may befall the Debtors and their estates if the Motion is granted.

### C.    Mr. Dahl Has A High Probability Of Prevailing In The Eviction Proceeding

51.    Mr. Dahl will, more likely than not, prevail in the Eviction Proceeding based upon the facts set forth in the Complaint in Eviction.  Moreover, the additional facts that have come to light since commencing the Eviction Proceeding, particularly the Prepetition Lease Assignment and Sale, the Subsequent Re-Assignment, the unauthorized use of approximately five (5) additional acres and what appears to be inconsistent Fluids Injection reporting, further strengthen Mr. Dahl's cause of action.  Accordingly, this factor weighs in favor of granting Mr. Dahl relief from stay.

## II.    The Debtors Have No Equity In The Leased Premises And The Lease Is Not Necessary To An Effective Reorganization.

52.    Pursuant to § 362(d)(2) of the Bankruptcy Code, a court should lift the automatic stay when a debtor lacks equity in the property subject to the stay, and such property is not

necessary for an effective reorganization. *See United Savings Ass'n of Texas v. Timers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

53.     Pursuant to 11 U.S.C. § 362(g), the party moving for relief from the automatic stay under section 362(d)(2) bears the burden of proof on the issue of whether the debtor has any equity in the property and the party opposing such relief has the burden of proof on all other issues. *See*, *e.g.*, *Timbers of Inwood Forest*, 484 U.S. at 376-77.

54.     Neither Pembroke nor any of the other Debtors own the Leased Premises. Therefore, none have any equity in the Leased Premises.  As a result, the Debtors bear the burden of "demonstrating that the collateral is necessary for a plan of reorganization 'that is in prospect' within a reasonable time." *In re American Sweeteners, Inc.*, 1999 Bankr. LEXIS 1457, at *11 (Bankr. E.D.Pa. 1999).  In *Timbers of Inwood Forest*, the Supreme Court addressed what is required of a debtor to meet its burden under 11 U.S.C. § 362(d)(2)(B):

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect.

484 U.S. at 375-76.  Accordingly, if no plan is feasible, then no property in the possession of the debtor can be necessary.  *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 567 (3d Cir. 1994).

55.     Here, no plan of reorganization has been filed by the Debtors and, as discussed above, it does not appear that a feasible plan of reorganization will be filed at any time in the near future.  Based on the foregoing, the equities weigh in favor of granting Mr. Dahl relief from the automatic stay pursuant to § 362(d)(2).

DM3\3449420.6

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Mr. Dahl respectfully requests an entry of an Order, substantially in the form attached hereto as Exhibit A, terminating the automatic stay so that the prepetition Eviction Proceeding may proceed and thereafter, if successful in the Eviction Proceeding, so that Mr. Dahl may terminate the Lease, take possession of the Leased Premises and exercise all rights and remedies afforded to him under the Lease and North Dakota law.

Respectfully submitted,

Dated: September 14, 2015                     DUANE MORRIS LLP

*/s/ Sommer L. Ross*
Michael R. Lastowski (3892)
Sommer L. Ross (No. 4598)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
mlastowski@duanemorris.com
slross@duanemorris.com

*Counsel for Nathan Dahl*

DM3\3449420.6